Sealed

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

19   81559

**CASE NO.**

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* FLORIDA HEALTH INTEGRITY PARTNERS, | **FILED IN CAMERA AND UNDER SEAL IN ACCORDANCE WITH THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)(2)** |
| Plaintiffs, | |
| v. | **DO NOT ENTER IN PACER** |
| HUMANA, INC.; HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC.; ITEX MANAGEMENT OF FLORIDA, INC.; KINDRED, INC.; NAVIHEALTH, INC.; REGENTS PARK, INC.; and TENET HEALTHCARE CORP., | **DO NOT PLACE IN PRESS BOX** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | FILED BY _____ D.C. NOV 15 2019 ANGELA E. NOBLE CLERK U.S. DIST. CT. S. D. OF FLA. - MIAMI |

CIV-MIDDLEBROOKS

**COMPLAINT**

2

## I.     NATURE OF THE ACTION

1.     Relator Florida Health Integrity Partners brings this False Claims Act ("FCA") action on behalf of the United States of America against Humana, Inc. ("Humana"), Humana Health Insurance Company of Florida, Inc. ("Humana of Florida"), Itex Management of Florida, Inc. ("Itex"), Kindred, Inc. ("Kindred"), naviHealth, Inc. ("Navi"), Regents Park, Inc. ("Regents Park"), and Tenet Healthcare Corp. ("Tenet" and together, the "Defendants") to recover millions of dollars of overpayments that Defendants have fraudulently obtained and retained from the federal government.

2.     Defendants' fraudulent scheme involves the manipulation of healthcare services provided to nursing home residents.  In cases where it is profitable for Defendants to deny patients necessary services, they will cause patients to lose their current insurance coverage or be discharged from a nursing facility before their recovery is complete.  On the other hand, where it is profitable for Defendants to provide more treatment to patients than is appropriate, they will administer unnecessary therapy services even to elderly or frail patients in order to bill Medicare at higher rates.  In both situations, patients are being harmed so that Defendants can illegally inflate their profits from Medicare.

3.     Defendant Regents Park is a nursing facility located in Palm Beach County, Florida.  A member of Relator Florida Health Integrity Partners has worked at this facility for approximately ten years.

4.     Defendant Humana is a private insurance company that offers Medicare Advantage plans in Florida through its subsidiary Defendant Humana of Florida, and across the nation through other subsidiary companies.  Medicare Advantage is a government program that contracts with private companies called Medicare Advantage Organizations ("MAOs") who agree to cover at

least all services covered by traditional Medicare and to comply with all other legal requirements of the program.  MAOs are paid by the government based on the expected costs of covering services for their beneficiary population.  Accordingly, a critical aspect of the Medicare Advantage program is that MAOs are prohibited from disenrolling beneficiaries just because they will require more costly services.  In clear violation of this prohibition, Humana closely monitors the course of treatment for its beneficiaries and intervenes to pressure beneficiaries to disenroll from its plans when more costly treatment is needed.  Not only does this illegal practice deprive the government of the services that it pays Humana to cover, it deprives patients of their choice of insurance at the time they need it the most.

5.      Defendant Navi is a private company that operates as a "convener" entity under a new government program called Bundled Payments for Care Improvement ("BPCI"), which seeks to reduce the cost of healthcare while improving patient outcomes by offering incentive payments to groups of healthcare companies that are able to work together to provide patients with necessary care at lower cost.  Navi and Defendant Tenet work together under this program, but rather than following program requirements they fraudulently increase their profits by simply denying patients necessary treatment.  Although Navi publicly touts a data-driven approach to patient care, in reality it operates a strict rationing system – it directs nursing homes to discharge patients that were admitted from a Tenet hospital after no more than two weeks regardless of whether those patients require further treatment.  This fraudulent scheme harms patient care and undermines the important policy goals that BPCI was enacted to serve.

6.      Defendant Kindred is one of the nation's largest providers of skilled therapy services.  Medicare payment for skilled therapy is based on the length and frequency of treatment, meaning that providers make greater profits the more intensive therapy they provide.  Kindred and

Regents Park fraudulently increase their Medicare payments by keeping patients on intensive skilled therapy regimens far longer than necessary.

7.      Together, these practices harm patients and defraud Medicare at every turn.  Patients confined to nursing homes are at the mercy of healthcare providers and Defendants treat them as pawns, denying them needed treatment and forcing unnecessary treatment upon them depending on which is more profitable.  These practices violate the FCA and entitle the United States to treble damages, penalties, and interest.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction under 31 U.S.C. §§ 3730 *et seq.* and 28 U.S.C. §§ 1331.  This Court may exercise personal jurisdiction over Defendants because they reside and/or transact business in this District or committed the proscribed acts in this District.  Venue lies in this District pursuant to 31 U.S.C. § 3732(a) in that many of the acts complained of took place in this District and/or the Defendants can be found, reside, or transact business in this District.

## III.      PARTIES

9.      The United States of America is the real party in interest to the claims of this action.

10.      The Department of Health and Human Services and the Centers for Medicare & Medicaid Services ("CMS") administer the Medicare and Medicaid programs.

11.      Relator Florida Health Integrity Partners is a partnership formed for the purpose of prosecuting this action, and its members have personal knowledge of the facts alleged in this complaint.

12.      Humana, Inc. is a Delaware corporation with principal executive offices at 500 West Main Street, Louisville, Kentucky 40202.  Humana's common stock is listed on the New York Stock Exchange.

13.     According to Humana's 2018 Annual Report, "[d]uring 2018, 81% of our total premiums and services revenue were derived from contracts with the federal government, including 15% derived from our individual Medicare Advantage contracts in Florida with … CMS, under which we provide health insurance coverage to approximately 636,800 members as of December 31, 2018." *Humana 2018 Annual Report at 3.*

14.     Humana is a holding company that conducts business through state-licensed insurance subsidiaries.  Defendant Humana of Florida is the Humana subsidiary that offers Medicare Advantage Plans in the State of Florida.

15.     Defendant Kindred is a privately-owned healthcare company.  Kindred's predecessor parent company, Kindred, Inc., was publicly-traded before being purchased in 2018 by Humana and two private equity firms, TPG Capital and Welsh, Carson, Anderson & Stowe.  Following this purchase, Kindred, Inc. was separated into two companies.  Defendant Kindred is now owned by TPG Capital and Welsh, Carson, Anderson & Stowe, and presently operates its contract rehabilitation therapy business through its subsidiary RehabCare, Inc.  *See* "Humana, Together with TPG Capital and Welsh, Carson, Anderson & Stowe, Announce Completion of the Acquisition of Kindred Healthcare, Inc.," Kindred Press Release (July 2, 2018), available at https://www.kindredhealthcare.com/news/2018/07/02/humana-together-tpg-capital-and-welsh-carson-anderson-stowe; RehabCare Website, available at https://www.rehabcare.com.

16.     Defendant Navi is a private company that is owned in part by investment funds managed by Clayton, Dubilier & Rice (55% ownership interest) and in part by Cardinal Health, Inc. (45%).  *See* "Clayton, Dubilier & Rice Closes Investment to Accelerate Growth of naviHealth ," CDR Press Release (Aug. 1, 2018), available at https://www.cdr-inc.com/news/press-

release/clayton-dubilier-rice-closes-investment-accelerate-growth-navihealth.  Navi's corporate headquarters are located at 210 Westwood Place, Suite 400, Brentwood, Tennessee 37027.

17.     Navi currently serves more than two million insured members and manages care transitions for approximately 800 acute hospitals and 11,000 post-acute care facilities nationwide.

18.     Defendant Regents Park operates the 180-bed nursing facility Regents Park Nursing & Rehabilitation Center located at 6363 Verde Trail, Boca Raton, Florida 33433.  Regents Park's NPI Number is 1780690339.

19.     Defendant Itex is a Florida for-profit corporation that operates Regents Park as well as a number of other nursing home facilities in Florida.

20.     Defendant Tenet is a multinational healthcare conglomerate that operates over 80 hospitals and 475 outpatient centers.  Tenet is a Fortune 500 company that is publicly-traded with stock listed on the New York Stock Exchange.  Its headquarters is located at 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202.

21.     Among the hospitals owned and operated by Tenet are Delray Medical Center ("Delray"), located at 5352 Linton Blvd., Delray Beach, Florida 33484, and West Boca Medical Center ("West Boca"), located at 21644 State Rd. 7, Boca Raton, Florida 33428.

## IV.     THE FALSE CLAIMS ACT

22.     The False Claims Act ("FCA") provides in pertinent part that any person who:

        (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

\*\*\*

(G)     knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government [for treble damages and such penalties as

are allowed by law].

31 U.S.C. § 3729(a)(1)(A), (B) and (G).

23.     The FCA further provides that "knowing" and "knowingly"

(A)     mean that a person, with respect to information-

(i)     has actual knowledge of the information;

(ii)     acts in deliberate ignorance of the truth or falsity of the

information; or

(iii)     acts in reckless disregard of the truth or falsity of the information;

and

(B)     require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

24.     An "obligation," as that term is used in 31 U.S.C. § 3729(a)(1)(G), includes "the

retention of any overpayment." 31 U.S.C. § 3729(b)(3).

25.     An "overpayment" is defined in the Social Security Act as "any funds that a person

receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] to which the person,

after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

26.     An overpayment must be "reported and returned" within 60 days after it was identified. 42 U.S.C. § 1320a-7k(d)(2).

27.     Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the Federal FCA civil penalties were adjusted to $5,500 to $11,000 per violation for violations occurring on or after October 23, 1996. In accordance with the Federal Civil Penalties Inflation Adjustment Act of 2015, those same Federal FCA civil penalty amounts were made applicable to all violations occurring on or before November 2, 2015. *See* 28 C.F.R. §§ 85.3 & 85.5 (2016); 81 Fed. Reg. 42491, 42500 (2016). In accordance with the Bipartisan Budget Act of 2015, 28 U.S.C. § 2461 (note) (2015), the Department of Justice has annually adjusted the penalties applicable to violations occurring after November 2, 2015 and assessed or enforced after August 1, 2016. As of the filing of this Complaint, the Federal FCA civil penalty amounts have been adjusted for violations occurring after November 2, 2015 and assessed or enforced after January 29, 2018 to $11,181 to $22,363 per violation. 28 C.F.R. § 85.5 (2018).

## V.     MEDICARE PROGRAM REQUIREMENTS

### A.     Medicare Advantage

28.     Medicare is a federal program administered by CMS that provides health insurance benefits to individuals age 65 and older and the disabled.  42 U.S.C. § 1395c et seq.  Parts A and B of the Medicare Program are known as "traditional" Medicare.  Medicare Part A covers

inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

29.     Under Medicare Part C (the "Medicare Advantage Program"), Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in managed health insurance plans called Medicare Advantage Plans ("MA Plans") that are owned and operated by private companies called Medicare Advantage Organizations.  MA Plans must provide Medicare beneficiaries at least all the services that they are entitled to receive from the traditional Medicare program.

30.     The Medicare Program pays each MAO a predetermined monthly amount for each beneficiary in the plan.  This monthly payment is known as a "per-member, per-month" capitated payment.  These capitated payments are risk-adjusted for each beneficiary based on demographic factors (*e.g.*, gender, age) and health status.  By risk-adjusting for health status, CMS pays more for beneficiaries with higher risk scores than for beneficiaries with lower risk scores.  CMS currently employs a health-based risk adjustment model known as the Hierarchical Conditions Category model, which takes into account patients' diagnoses from healthcare encounters that are submitted by the MAO to CMS.

31.     The Hierarchical Conditions Category adjustment model is prospective, meaning that a beneficiary's risk score for a particular year is determined by his or her medical conditions during the prior year.

32.     The legal obligations of MAOs under the Medicare Advantage Program are set forth in CMS regulations and MAOs certify annually in writing to compliance with those obligations. 42 C.F.R. §§ 422.504 & 422.505 (Part C).

33.     CMS rules require that MAOs certify their adherence to requirements regarding who enrolls in the plan, the services provided to those members, and under what limited conditions members may be disenrolled.  In general, these rules require MA plans to accept any Medicare beneficiary who is eligible to enroll without regard for preexisting health conditions or prior claims experience and are prohibited from discriminating on these bases in their enrollment and disenrollment activities, or encouraging members to disenroll from the plan for any reason.

34.     This prohibition against discrimination on the basis of health status is an essential component of any healthcare program that depends on capitation rates as a means of reimbursement.  Such monthly rates are based on projected average costs per member per month, and thus recognize that some members will require more care than the capitation rate will cover, but most others will require less care.  As a general rule, a small segment of the membership of most managed care plans—the sickest members—generally accounts for a substantial portion of all of the healthcare expenses for the entire plan.  Accordingly, a substantial portion of the capitation rate for each member is actually attributable to the expected cost of treating those few sickest patients.

35.     For this reason, an MAO that "cherry picks" its enrolled population by coercing the sickest members to disenroll from its plan will receive a windfall at the expense of CMS and other MA Plans because its reimbursements are based on the assumption that profits generated on the majority of members will be offset by losses on those sick members.  Thus, the prohibition against cherry-picking in the contracts between MAOs and CMS is an essential component of this program, without which the capitation rate setting process does not work.

36.     This is so because risk status cannot predict the exact cost of providing covered health services to a given patient.  Two patients with the same overall risk score may cost a plan

11

substantially different amounts in claims expense when one patient requires more and/or more expensive services than the other.

37.     Simply put, MAOs will lose money on beneficiaries whose claims exceed their risk-adjusted Medicare payments, while MAOs that successfully reduce the cost of providing all necessary care to their beneficiaries will make a profit, as CMS calculates the amount of its payments to MAOs based on beneficiaries' diagnoses and not by their claims expense.

38.     The risk-adjusted capitated payment system is vulnerable to manipulation by dishonest MAOs.  An MAO that can identify in advance which beneficiaries will require more expensive services than the average for their diagnosis could illegally pressure just those individuals to disenroll from their plans and shift them to another MA Plan or to traditional Medicare.  Such a scheme would result in the MAO being overpaid by CMS because they are not in fact providing all of the covered healthcare services that are included in the payments they receive from CMS.

39.     Federal law responds to this risk by prohibiting MAOs from discriminating among beneficiaries on the basis of their health status, and from taking any action that would encourage a beneficiary to disenroll from their plan.  42 C.F.R. § 422.110(a) ("[A]n MA organization may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan offered by the organization on the basis of any factor that is related to health status"); 42 C.F.R. § 422.74(a) ("Except as provided in paragraphs (b) through (d) of this section, an MA organization may not…Orally or in writing, or by any action or inaction, request or encourage an individual to disenroll.").

40.     An MAO may only disenroll a beneficiary in limited extenuating circumstances, such as when the beneficiary does not pay a required premium, commits "disruptive behavior," no longer resides in the plan area, or dies.  42 C.F.R. § 422.74(c).  Before an MAO can disenroll an active

beneficiary, it must give prior notice to that beneficiary explaining the reasons for disenrollment. 42 C.F.R. § 422.74(d).

41.     Historically, very few people voluntarily switch from an MA Plan to traditional Medicare.  A Kaiser study found that in 2013 and 2014, only 2% of Medicare Advantage enrollees voluntarily disenrolled from their MA Plan and switched to traditional Medicare. *The Henry J. Kaiser Family Foundation, "Medicare Advantage Plan Switching:  Exception or Norm?" (Sept. 2016)*.

42.     To keep Medicare beneficiaries from continually revolving among MA Plans, or disenrolling from MA Plans to traditional Medicare, CMS created limited windows during which beneficiaries may elect to enroll or disenroll.  These enrollment windows include the Annual Election Period from November 15 to December 31, in which beneficiaries can freely move in or out of MA plans, and the Open Enrollment Period, from January 1 to March 31, in which beneficiaries are allowed to make a single election to enroll or disenroll from an MA Plan.  Special Election Periods also create a fixed window of time for beneficiaries whose status has changed, such as by moving to a new county or losing coverage through their employer, to enroll in an MA plan.

43.     In addition to the above requirements, MAOs must implement an effective compliance program to ensure that Medicare Advantage Program rules are followed.  42 C.F.R.§ 422.503(a).

44.     Specifically, each MAO must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

### B.    Bundled Payments for Care Improvement (BPCI)

45.    The Centers for Medicare & Medicaid Services implemented the Bundled Payments for

Care Improvement ("BPCI") initiative under the authority of the Center for Medicare &

Medicaid Innovation to test whether linking provider payments for an "episode" of care could

reduce Medicare payments while maintaining or improving the quality of care to patients.

46.    BPCI is a voluntary initiative that allows participants to choose among several key design

options, such as what patient diagnoses will be included.  The BPCI initiative rewards

participants for reducing Medicare payments for an episode of care relative to a target price.  The

clinical episodes are defined by the patients' Medicare Severity-Diagnosis Related Group (MS-

DRG).

47.    Among the goals of the BPCI initiative is to improve "patient and family engagement

through the care continuum," by, for example, "comunicat[ing] and engag[ing] with providers,

patient, and family throughout the episode by providing ongoing care and support," and

"engag[ing] patient and family through education and shared decision-making in discharge

planning and placement decisions to support patient rights and preferences." *CMS, "Bundled*

*Payments for Care Improvement (BPCI) Initiative:  Public Toolkit" (Revised Feb. 2019).*

48.    BPCI has been implemented in four "Models."  Model 1 began first and concluded on

December 31, 2016.  Model 1 defined an episode of care as the inpatient stay in the acute care

hospital.  Model 2 has the most comprehensive bundle, which includes the triggering hospital

stay (i.e., the "anchor hospitalization") and all items and professional services (with certain

exclusions) furnished within the chosen episode length of 30, 60, or 90 days post-discharge.  The

Model 3 bundle includes items and services furnished after the anchor hospital discharge, within

the chosen episode length of 30, 60, or 90 days.  The episode starts when a beneficiary is

14

admitted to an episode-initiating skilled nursing facility, home health agency, inpatient rehabilitation facility, or long-term care hospital within 30 days of discharge from a hospitalization for a chosen clinical episode.  The Model 4 bundle includes the anchor hospitalization, all professional services during the anchor hospitalization, and any readmissions and associated professional services that occur within 30 days of discharge that are not explicitly excluded from the bundle.  *LewinGroup, "CMS Bundled Payments for Care Improvement Initiative Models 2-4: Year 5 Evaluation & Monitoring Annual Report" (Oct. 2018), at 14* (the "Lewin Report").

49.     BPCI participants have incentives to reduce Medicare payments for the bundle of services in an episode of care.  Under Models 2 and 3, Medicare episode payments are compared to a target price determined by CMS that is based on historical payments attributed to the episode-initiating provider for the same type of clinical episode.  When aggregate Medicare episode payments are less than the target price, Awardees may receive net payment reconciliation amounts equal to the difference, which they can keep or share with their partnering providers.  When aggregate episode payments are higher than the target price, Awardees may have to pay amounts to CMS.  In this way, Model 2 and 3 Awardees have incentives to reduce aggregate episode payments.  *Lewin Report at 13.*

50.     One type of participant involved in BPCI is a "convener," which is an entity that does not itself provide healthcare services but assists others in providing those services.  Conveners may assist with clinical episode selection, provide administrative support and data analysis, and may assist providers with tracking patients after discharge through the provision of services such as case managers or call centers that conduct follow-up phone calls with patients.  *Lewin Report at 24.*

15

51.     In Model 2, the episode-based payment is retrospective.  Medicare continues to make fee-for-service payments to providers and suppliers furnishing services to beneficiaries in Model 2 episodes, after which the total payment for a beneficiary's episode is reconciled against a bundled payment amount (the target price) predetermined by CMS.  Participants choose to participate in one or more of the 48 episodes, and they must select the length of each episode (30, 60, or 90 days following discharge).  *CMS, "Bundled Payments for Care Improvement Initiative (BPCI), Background on Model 2 for Prospective Participants" (Feb. 2014), available at* <u>*https://innovation.cms.gov/Files/x/BPCI_Model2Background.pdf*</u>.

52.     The total Medicare spending for included items and services for an eligible beneficiary during the length of the episode is compared to a predetermined bundled payment amount (the target price) following the conclusion of the episode.  This retrospective reconciliation compares the total dollar amount of Medicare fee-for-service expenditures for items and services (collectively referred to as "Aggregate FFS Payment") furnished by the Awardee, the Episode Initiator, and other providers and suppliers during an episode with the target price.  This retrospective reconciliation determines whether amounts are owed to the Awardee or to CMS.  *Id.*

53.     Notably, a recent report on the progress of BPCI found that while program participants as a whole reduced healthcare payments during covered episodes of care, the incentive payments that participants received from CMS were so large that they exceeded the amount of savings generated for Medicare by the program as a whole.  *Lewin Report at 3.*

### C.     Medicare Coverage For Skilled Therapy

54.     Medicare Part A generally covers medically necessary skilled nursing and rehabilitation care.  Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and

rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying inpatient hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b)-(c); *see also* 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care). After the first 20 days, however, a co-payment of twenty percent (20%) is required of the patient.

55.     The conditions that Medicare imposes on its Part A skilled nursing facility benefits include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

56.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); *Medicare Gen. Info., Eligibility, & Entitlement Manual, ch. 4, § 40.3.*

57.     To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical

personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

58.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g., aides or nursing personnel ...." *Medicare Benefit Policy Manual, ch. 8, § 30.4.1.1.*

59.     In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e).

60.     Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).* The amount paid depends on the resource needs of the residents. Residents with heavy care needs require more staff resources and payment levels are thus higher than for those residents with fewer needs.

61.     The daily PPS rate that Medicare pays a nursing facility depends, in large part, on the Resource Utilization Group ("RUG") to which a patient is assigned. Each distinct RUG is

18

intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. Since October 1, 2010, Medicare has utilized the RUG-IV classification system pursuant to which there are 66 RUG levels.

62.     There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

63.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received, the number of days per week the therapy was received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-IV classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very high | minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

*63 Fed. Reg. at 26,262.*

64.     Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High RUG level (RU) is "intended to apply only to the most complex cases requiring

rehabilitative therapy well above the average amount of service time." *63 Fed. Reg. 26,252, 26,258 (May 12, 1998).*

65.     The rehabilitation RUG level has a significant impact on the Medicare daily rate for a beneficiary receiving skilled therapy.  For Fiscal Year 2019, the daily rates in Palm Beach County were less than $400/day for Low, approximately $400/day for Medium, $450/day for High, $500/day for Very High, and $600/day for Ultra High.

66.     Completion of the Long-Term Care Minimum Data Set ("MDS") is a prerequisite to payment under Medicare. *See 63 Fed. Reg. at 26,265.* Further, skilled nursing facilities must use the RUG-IV level that the CMS software has calculated, and that CMS has then validated, when bills are submitted for payment. The MDS itself requires an express certification on behalf of the provider that states:

> I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.

*MDS – Ver. 3.0 for Nursing Home Resident Assessment and Care Screening.*

67.     A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in Form CMS-1450, which nursing facilities submit electronically to Medicare for payment. *Medicare Claims Processing Manual, ch. 25, § 75.5.* Medicare payment will depend largely on the HIPPS code the nursing facility

submitted as part of Form CMS-1450. *See 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, ch. 25 § 75.5.*

68.     Skilled nursing facilities submit Form CMS-1450 electronically under Medicare Part A to Medicare payment processors known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries. MACs process and pay Medicare claims.

## VI.     FACTUAL ALLEGATIONS

### A.     Humana Illegally Exerts Pressure To Disenroll Or Deny Necessary Services To Patients When The Services They Require Become Costly

69.     Many residents at Regents Park are covered by Humana's Medicare Advantage Plans. As explained above, Humana loses money when these patients require treatment that is more expensive than is typical for their diagnosis, and profits when they require less.

70.     Regents Park administrative staff hold Weekly Meetings to discuss the plan of care for each of their residents.

71.     Humana sends a representative to participate in these Weekly Meetings even though that representative has no clinical interaction with its beneficiary residents.

72.     The function of Humana's representative is simple – this person monitors the plan of care for Humana's insureds to identify those patients that will require expensive treatment in the near future.  As soon as it becomes apparent that a beneficiary will require costly services and thereby cost Humana money, its representative directs Regents Park staff to pressure that individual to disenroll from Humana's Medicare Advantage Plan.

73.     In cases where disenrollment is not possible or the most profitable course for Humana, its representative will direct Regents Park staff to simply limit the amount and nature of healthcare services that it provides to a given resident.

21

74.     Indeed, even in the absence of imminent expensive care, the Humana representative will direct Regents Park staff to discharge patients before they have fully recovered and while they still require additional treatment.

75.     This practice is in direct violation of Medicare rules that prohibit MAOs from taking *any action* to encourage beneficiaries to disenroll, or to limit their ability to receive covered healthcare services.

76.     The Administrator of Regents Park makes it clear to the facility's staff that they must follow the direction of the Humana representative.  Humana can exert leverage over the facility because it has influence over a large beneficiary population and could guide beneficiaries away from Regents Park and towards other nursing facility competitors.

77.     Accordingly, Regents Park staff will approach the patients that Humana wishes to disenroll and tell them or their families that they should switch their coverage to traditional Medicare and/or to Medicaid.  Regents Park's Assistant Administrator or other staff will prepare the paperwork to disenroll patients from Humana and, where applicable, to have patients apply for Medicaid.

78.     The Humana representative suggests ways that facility staff can encourage patients to disenroll or leave the facility, such as by telling them or their families that a "new baseline" has been reached in their recovery and that they will not improve with additional treatment.  This is patently false, as the reason that Humana selected the patient for disenrollment was because they will require costly treatment.

79.     At the direction of Humana, facility staff will falsely tell patients that Humana's Medicare Advantage plan does not cover as much treatment as traditional Medicare, and that

they can receive more treatment and stay at Regents Park longer if they switch to traditional Medicare.

80.     If a patient resists disenrolling from Humana's Medicare Advantage Plan, facility staff will encourage the resident to leave the facility and receive home health services instead, or may simply discharge the resident even though they require further treatment.

81.     One member of Regents Park staff openly reassured the Humana representative that they would switch a Humana beneficiary to Medicaid even if that resulted in the individual having to leave the facility.  In a similar example, a resident who was a Humana beneficiary was told the facility would send them home with a wheelchair, since that was cheaper for Humana than continuing to cover the cost of that patient's necessary treatment.

82.     It was discussed at Weekly Meetings that every Humana beneficiary should have a "Plan B," in the likely event they did not remain at Regents Park long enough to reach their full clinical potential.  Patients were directed to be discharged early unless they required so little care as to not need a nursing home at all.

83.     This coercion was applied without regard to patients' best interests.  MAOs are legally required to cover at least the range of services offered by traditional Medicare and many cover more.  As a result of this fraudulent and illegal conduct, residents of Regents Park are made to switch to a healthcare option with lesser coverage, or to have their healthcare benefits improperly limited, at precisely the time that they require increased care.

84.     Humana's actions described herein increase the government's financial burden and undermine the Medicare program in at least three ways:

          a.   First, when Humana disenrolls its most "expensive" patients, these individuals are
               frequently placed back on Medicare and/or Medicaid, shifting their healthcare

23

obligations to these programs when Humana had accepted the risk of increased

costs by participating in the Medicare Advantage program and receiving risk-

adjusted payments from the government on account of patients' diagnoses;

b.  Second, as Humana profits from the differential between its projected and actual

costs, the government is essentially paying Humana an additional "profit" when

they violate the law by pressuring their most expensive patients to disenroll; and

c.  Third, Humana's profit-driven scheme acts to deprive their patients of their

preferred health insurance when they need it the most.  Patient choice is a key

element of the Medicare Advantage program and Humana undermines this policy

goal by manipulating patients' insurance coverage depending on the future costs it

will incur.

### 1.    Specific Patient Examples

85.    At the March 4, 2019 Weekly Meeting, Humana directed that **Patient 1** be immediately

discharged from the facility regardless of his or her medical condition or needs.[1]  **Patient 1** had

been admitted to Regents Park exactly two weeks earlier with multiple diagnoses including a left

rib fracture.

86.    Humana further directed that **Patient 2** be discharged the following day, again without

regard to his or her clinical condition.  **Patient 2** was admitted to Regents Park three weeks

earlier.  It was most common for Humana to direct a maximum stay of two-weeks, but in some

circumstances they directed a patient be treated for three weeks or longer.

---

[1] The patient examples in this Complaint have been anonymized to protect their identity.
Relator has separately provided the Department of Justice with identifying information regarding
these individuals.

24

87.     Also at the March 4th meeting, Humana noted that **Patient 3's** condition was "complex" and that the facility staff should speak with this patient's spouse about disenrolling him or her from Humana's Medicare Advantage Plan.  This patient had multiple diagnoses including Parkinson's disease, Hodgkin lymphoma, and aspiration pneumonia.

88.     At the April 8, 2019 Weekly Meeting, the Humana representative decreed that **Patient 4** would be given only a two-week stay.  The following week, the representative decided that **Patient 4** was "too sick" and that the facility needed to "get him on Medicare."  This direction was repeated at the April 22nd meeting, in which the Humana representative declared the patient needed to "get out."

89.     Also at the April 8th meeting, Humana directed that **Patient 5** would be given only a two-week stay, and that **Patient 6** should be "encouraged to apply to Medicaid."  This same direction regarding **Patient 6** was repeated at the April 15th meeting.  This patient's medical records from the April 22nd meeting indicate that the patient was enrolled in Medicaid on that date.

90.     At the April 15, 2019 meeting, Humana directed that **Patient 7** be discharged from Humana's Medicare Advantage Plan and enrolled in traditional Medicare and Medicaid, even though it was discussed in this meeting that the patient had made "significant progress" during the prior six days of rehabilitation therapy (which Medicare covers but Medicaid does not).

91.     Humana further directed during this meeting that two other patients, **Patient 8** and **Patient 9**, be disenrolled from Humana and transferred to Medicaid.  **Patient 8**'s medical record for this meeting indicated as a "barrier" to discharge that this patient "can't afford more help." **Patient 9**'s medical record for this meeting similarly indicated as a "barrier to discharge" that the patient "can't hire help."

### B.    Navi Directs Patients To Be Discharged Before They Have Received All Necessary Treatment

92.    Regents Park also has residents who have been admitted to the facility directly from the Tenet hospitals Delray and West Boca, and who are covered by the BPCI Program.  Under this program, Tenet and its "convener" Navi can receive incentive payments from CMS if they can reduce the necessary healthcare costs for covered patients who are discharged from a hospital stay into post-acute care, such as a nursing facility.

93.    A representative from Navi also participates in Regents Park's Weekly Meetings, and for a similar reason as does the Humana representative – to get a preview of the treatment that is needed for covered patients and to intervene to manipulate (restrict) that treatment to increase profits for Navi and Tenet.

94.    The directives from the Navi representative reflect a strict rationing of post-hospital care that is made without regard to the individualized needs of patients or input from their clinical providers.

95.    Here again, staff of Regents Park are coerced to obey Navi's directives out of fear that they would otherwise lose Tenet as a source of new resident admissions, as Tenet is a major source of nursing home admissions not only in the Palm Beach area but nationwide and has the ability to direct its discharged patients away from other nursing home facilities managed by Itex and their web of related owners.  Similarly, Navi acts as a convener for other local hospitals as well and could influence those hospitals to direct their discharged patients away from Regents Park.

96.    The Navi representative instructs Regents Park staff on how long covered residents should remain at the facility, and in the vast majority of cases the answer is only two weeks.

This length of time is set mechanically rather than after consideration of each patient's unique medical condition and needs.

97.     Although one of CMS's goals for the BPCI Program is to improve communication among providers and patients, Regents Park staff are generally told not to inform residents that they are being overseen by Navi or covered by a special government incentive program.

98.     As with patients that Humana wishes to disenroll, Navi directs facility staff to convince residents and their families that they should lower their expectations for the resident's clinical improvement and accept an early discharge from Regents Park.

99.     In this way, patient care is being rationed without the patient even knowing what company (not a clinician) is making the decision of how much medical care they will receive. This scheme undermines the purpose and structure of the BPCI Program by providing worse healthcare while costing CMS more money.

100.    Navi's actions described herein increase the government's cost of providing healthcare benefits and undermine the policy goals of the BPCI Program in at least three ways:

    a.   First, Navi is fraudulently inflating its profits under the BPCI program by artificially lowering the costs that it and/or its BPCI partners incur for providing medically necessary care to patients;

    b.   Second, Navi is increasing the costs of providing healthcare benefits to Medicare beneficiaries because patients who are discharged from a nursing facility before their treatment is complete are more likely to have future health complications as a result and return to the hospital or other provider to address those complications; and

c.  Third, Navi is undermining the purpose of the BPCI Program, which is to experiment with new payment models that encourage cost savings while continuing to provide all necessary care to patients. Patients are deprived of medically necessary and legally covered treatment in order to artificially inflate the profits of Navi and/or its BPCI partners.

### 1.  Specific Patient Examples

101.  At the April 15, 2019 Weekly Meeting, the Navi representative stated with regard to **Patient 10** that Navi "wants him out" of the facility. The Navi representative was upset at this meeting because he had overlooked this patient when he was first admitted to Regents Park nearly one month prior and would have pressured the facility to discharge him earlier. Because it was impractical to discharge this patient immediately without any explanation or warning, the Navi representative reluctantly agreed that the patient could remain at Regents Park until April 26, 2019 but should be discharged at that time.

102.  As with all referenced patient examples, this discharge directive was made without any input from clinicians who provided care to the patient and knew best what treatment was necessary and appropriate.

103.  Also at the April 15th meeting, the Navi representative directed that facility staff talk the family of **Patient 11** into a "new baseline" of progress. This patient was receiving skilled care under Medicare Part A but Navi wanted the patient switched to Medicaid, which does not cover the same types of treatment.

104.  **Patient 12** was discussed at the April 8th and 15th meetings. At the direction of the Navi representative, the discharge date for this patient was set for April 18th. However, this patient had been making progress and additional treatment was indicated. Despite efforts by Navi to

convince the patient and family that a "new baseline" had been reached and no further progress was possible, the family appealed the discharge determination.

### C.   Kindred And Regents Park Provide Unnecessary Skilled Therapy To Inflate RUG Levels And Medicare Reimbursements

105.   While companies that provide Medicare Advantage Plans and participate in the BPCI Program can inflate their profits by limiting or denying patient care, companies that provide skilled therapy to Medicare beneficiaries can inflate their profits by providing *excessive, unnecessary* services.

106.   Medicare covers skilled therapy treatment and pays more when that therapy is of greater intensity (*i.e.*, is provided for more minutes each week).  To maximize their revenues, Regents Park and its contract therapy company Kindred provide excessive (often "Ultra High") levels of skilled therapy to patients that do not need that level of treatment.

107.   The provision of unnecessary therapy, particularly in the case of physical therapy, can be harmful to patients who are elderly or frail.  The Ultra High RUG level is reached only by providing at least 720 minutes (12 hours) of therapy a week.  This subjects patients to hours and hours of unnecessary treatment, often during periods when they are suffering from various medical conditions or old age, which can result in severe physical and mental injuries.

108.   To implement this scheme, Regents Park and Kindred will fabricate clinical conditions that (if true) would justify the provision of greater amounts of skilled therapy to residents. Regents Park outsources the provision of skilled therapy services at its facility to Kindred.

109.   In some cases, this involves providing a patient with additional types of skilled therapy – physical, occupational, or speech therapy – in addition to what they actually require.  In other cases, this involves misrepresenting that a patient requires even one type of therapy when they do not require skilled therapy at all.  In many cases, once a patient begins skilled therapy, Regents

Park and Kindred will keep providing skilled therapy to that patient as long as Medicare will pay for it, well beyond the time when it provides any clinical benefit to the patient.

110.    So long as Regents Park can find any reason to keep a resident admitted to its facility, such as because they require nursing services like wound care, they will endeavor to mandate skilled therapy for that patient regardless of whether there is a medical need for that service.

111.    One of the nursing services that Regents Park uses to justify keeping patients at the facility and billing Medicare for their treatment is respiratory therapy.  Regents Park instructs its respiratory therapists to bill a pre-determined number of minutes per treatment, regardless of how much time was actually spent with a patient, to maximize Medicare revenue.  For example, respiratory therapists are instructed to bill 30 minutes if one medication is delivered by a nebulizer and 45 minutes if two medications are so delivered, to bill 15 minutes for turning a CPAP (Continuous Positive Airway Pressure) device on or off, and 30 minutes for an assessment with an additional 15 minutes if equipment is prepared.

112.    The total number of respiratory minutes that Regents Park bills to Medicare is inflated to such a degree that it lacks the staff necessary to administer treatment for all minutes billed.

### 1.    Specific Patient Examples

113.    At the March 4, 2019 Weekly Meeting, **Patient 13** was discussed.  This patient had been admitted to the facility on February 16, 2019 and had been kept on physical therapy since that time in order to bill Medicare even though the patient was unable even to walk.

114.    Also at the March 4th meeting, **Patient 14** was discussed.  This patient was to be discharged the following day because they had exhausted the 100 days of skilled therapy that Medicare covers.  This patient had been given physical and occupational therapy for the entire duration of their stay.

115.    At the April 1, 2019 Weekly Meeting, it was discussed that **Patient 15** had a scheduled discharge date of April 11th.  It was determined to postpone discharge by 8 days to bill for skilled therapy.  During the April 15th meeting, it was decided that **Patient 15** should remain on skilled therapy until April 23rd because his therapy could be billed at a high rate.

116.    Also at the April 1st meeting, skilled therapy was continued for **Patient 16**, although this patient had no need for any skilled treatment. At the April 15th meeting, it was decided that **Patient 16** should also receive speech therapy, which would increase Medicare's reimbursement rate.

117.    **Patient 17** was discussed at the April 15, 2019 Weekly Meeting.  Although the patient did not require rehabilitation therapy or any nursing home treatment, this patient was assigned to skilled therapy for a two-week period.

118.    **Patient 18** was a long-term resident at Regents Park that suffered from paraplegia and has not walked in over ten years.  This patient had been a private-pay resident since 2015 and had received custodial care. However, after she had a hospital stay in March 2019 that qualified her under Medicare Part A for skilled therapy (only if needed), she was subjected to unnecessary physical therapy solely to bill Medicare.

## VII.    COUNTS

### COUNT I:  FALSE OR FRAUDULENT CLAIMS
**Federal False Claims Act
31 U.S.C. § 3729(a)(1)(A)**

119.    Relator repeats and re-alleges paragraphs 1-118 as if fully set forth herein.

120.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

121.    Such actions were done knowingly, as that term is defined in 31 U.S.C. § 3729(b)(1).

122.    Because of Defendants' acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act plus civil penalties for each violation.

## COUNT II:  FALSE STATEMENTS
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

123.    Relator repeats and re-alleges paragraphs 1-118 as if fully set forth herein.

124.    Defendants knowingly made or used, or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

125.    Such actions were done knowingly, as that term is defined in 31 U.S.C. § 3729(b)(1).

126.    Because of Defendants' acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act plus civil penalties for each violation.

## COUNT III:  REVERSE FALSE CLAIMS
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

127.    Relator repeats and re-alleges paragraphs 1-118 as if fully set forth herein.

128.    Defendants knowingly made or used, or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

129.    Such false records or statements or concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(b)(1).

130.    Because of Defendants' acts, the United States has sustained damages in an amount to be determined at trial and therefore is entitled to treble damages under the False Claims Act, plus civil penalties for each violation.

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator respectfully requests that this Honorable Court enter judgment in its favor and in favor of the United States of America and against Defendants as follows:

A.  For the United States, treble damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1);

B.  For pre-judgment interest on all damages awarded;

C.  For any and all reasonable costs, expenses and attorneys' fees;

D.  For an award to Relator in the maximum amount permissible under law; and

E.  For such other and further relief as the Court deems just and equitable.

## IX.   <u>DEMAND FOR JURY TRIAL</u>

A jury trial is demanded in this case.

November 15, 2019

Respectfully submitted,

Michael J. Brevda (Bar No. 084048)
David J. Brevda (*pro hac vice forthcoming*)
Senior Justice Law Firm
7700 Congress Avenue
Suite 3216
Boca Raton, FL 33487
(561) 717-0813
michael@seniorjustice.com
david@seniorjustice.com
eservice@seniorjustice.com


Gary L. Azorsky
Jeanne A. Markey
Raymond M. Sarola
(*pro hac vice forthcoming*)
Cohen Milstein Sellers & Toll PLLC
3 Logan Square, 1717 Arch Street
Suite 3610
Philadelphia, PA 19103
(267) 479-5700
gazorsky@cohenmilstein.com
jmarkey@cohenmilstein.com
rsarola@cohenmilstein.com

*Attorneys for Relator*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that service of the above Complaint will be made on this date by certified mail, return receipt requested upon the below counsel.

| | |
|---|---|
| The Honorable William P. Barr<br>Attorney General of the United States<br>United States Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001 | The Honorable Ariana Fajardo Orshan<br>United States Attorney for the<br>Southern District of Florida<br>99 NE 4th Street<br>Miami, FL 33132 |

DATED: __11-15-2019__

Michael J. Brevda (Bar No. 084048)
David J. Brevda (*pro hac vice forthcoming*)
Senior Justice Law Firm
7700 Congress Avenue
Suite 3216
Boca Raton, FL 33487
(561) 717-0813
michael@seniorjustice.com
david@seniorjustice.com
eservice@seniorjustice.com